STATE, RESPONDENT, *v.* SHAFER, APPELLANT.

[No. 1269.]

[Submitted Nov. 29, 1898. Decided Dec. 19, 1898.]

*Homicide—Evidence—Character of Parties—Instructions.*

1. On a trial for murder, defendant can prove that his general reputation for peacefulness was good, by witnesses who knew defendant, and lived in the community in which he lived, although they never heard defendant's reputation in that respect discussed.
2. Error in excluding testimony tending to show good character is not cured by admitting the testimony of other witnesses to the same effect.

3. On a trial for murder, where the defendant claims that the killing was done in self-defense, it is error to refuse to allow defendant to state what kind of a man the deceased was physically.

4. Where there was evidence that deceased was the assaulting party, it was competent to prove that the general reputation of deceased for peace and quiet was bad, under a plea of self-defense.

5. It is error to allow a declaration made by deceased 30 minutes before the homicide that he (deceased) had had a difficulty with defendant, and that he (deceased) was not armed, and was afraid of defendant, to show that deceased was not armed at the time he was shot by defendant.

6. Neither was it admissible as a part of the *res gestœ*.

7. An instruction that "it is only necessary that the act of killing be preceded by a concurrence of will, deliberation and premeditation on the part of the slayer, and, if such is the case, the killing is murder in the first degree," is erroneous as a definition of murder in the first degree, since it omits the words "malice aforethought."

8. Where the record shows many technical objections of the prosecuting attorney to competent evidence offered by defendant, and many technical rulings excluding such testimony, as well as admitting testimony of like character on the part of the state, and many instructions that approach closely the border line of prejudicial error, if they do not cross it, and the charge contains a confused and voluminous mass of not wholly harmonious declarations of the law, a new trial will be awarded, on the ground that defendant has not had a fair trial.

*Appeal from District Court, Silver Bow County; William Clancy, Judge.*

JOSIAH SHAFER was convicted of murder in the first degree, and appeals. Reversed.

*M. J. Cavanaugh, B. Noon,* and *Francis Brooks,* for Appellant.

*C. B. Nolan, Guy W. Stapleton,* and *C. P. Connolly,* for the State.

**PEMBERTON, C. J.**—The defendant was convicted of murder in the first degree on the 14th day of November, 1897, in the District Court of Silver Bow county. On April 23, 1898, he was by the judgment of the court sentenced to be hanged. From the judgment, and order of the District Court refusing him a new trial, this appeal is prosecuted.

There is an immense record in the case, presenting the evidence and numerous assignments of error alleged to have been committed by the trial court in admitting and excluding testimony, and in the giving of instructions to the jury.

Several witnesses on the part of the defendant testified that they knew the defendant, and had known him in the commu-

nity where he lived for a considerable time prior to the homi-
cide, and that his general reputation for peace and quiet was
good.    They all, however, testified on cross-examination that
they had never heard his reputation discussed at all.    Because
these witnesses stated  that they had  never heard  the defend-
ant's reputation  in  this  respect  discussed, the court, on the
motion of  the prosecuting  attorney, and  against defendant's
objection, struck out all their  testimony.    We think it was
competent for  the defendant  to prove good  character by this
negative testimony.    Upon  this subject it is said in  Rice on
Evidence, Vol. 3,  Sec.  380:  "The  propriety  of  this  rule,
permitting negative evidence of  good  character, is  gradually
forcing itself upon the recognition of  the courts, and there is
a current and modern authority rapidly forming in support of
it.    *    *    *    The authorities abundantly establish  that the
person testifying  need  not  base  his means of  knowledge  on
what is 'generally said' of the  person whose character  is  in
question, but  may base  his  knowledge  of  the  reputation  of
such person on evidence of the negative nature above noted."
See authorities cited in section 380, *supra*.

Counsel for  the State say no foundation was  laid for  this
negative evidence, by showing the witnesses would have likely
heard any discussion that might be had concerning defendant's
reputation.    But these witnesses stated they knew the defe d-
ant, and,  evidently,  very  intimately, and  also  knew  people
who were acquainted with defendant; and we think they were
so well acquainted with him, and with people who  knew him,
that it may be reasonably inferred that they would have heard
any discussion that defendant's neighbors might have had con-
cerning his reputation.

It seems  also, from  the record, that the  court permitted
witnesses on the part of the State to testify, over the objection
of defendant, to the bad reputation of defendant and the good
reputation of  deceased, who showed  no more qualification  to
testify than  the witnesses offered by the defendant, whose evi-
dence was excluded by the court.    If it was proper to exclude
the evidence of  defendant's witnesses under the circumstances

disclosed by the record, for the same reason the testimony of the State's witnesses should likewise have been excluded.

It is also contended by the State that other witnesses gave like testimony, which was not stricken out, and that therefore, if the striking out of such testimony was error, it was not prejudicial. But defendant was entitled to have the jury consider all of his testimony. We cannot say that he was not prejudiced by striking out part of it on a material point, because like testimony had not been stricken out.

When the defendant was on the stand, he was asked what kind of a man the deceased was physically. This was objected to, and he was not permitted to answer the question. This was error.

Matt Lewis, a witness for defendant, testified that the reputation of deceased for peace and quiet was bad. This evidence, on motion of the prosecuting attorney, was stricken out. This was error. There was evidence tending to show that the deceased was the assaulting party at the time of the homicide, and it was competent to prove the general reputation of the deceased for peace and quiet under the plea of self-defense.

The court permitted witnesses to testify to declarations made by the deceased to them in the absence of the defendant, about thirty minutes before the homicide, that he (deceased) had had a difficulty with the defendant at Columbia Gardens that night; that he was not armed; that he was afraid of the defendant; that he wanted protection from defendant; that he wanted defendant arrested, etc. It seems that this evidence was admitted for the purpose of showing deceased was not armed at the time he was shot by defendant. But we know of no theory upon which it was admissible. It was not a part of the *res gestæ*. It was clearly hearsay, and it was just as clearly error to admit it. (*People* v. *Irwin*, 20 Pac. 56 (Cal.); *People* v. *Carlton*, 57 Cal. 83, and authorities cited.)

We are called upon to treat the instructions given by the court to the jury. The task is appalling. Fifty-nine instructions were given, and nearly all of them are attacked by innumerable assignments of error. It is out of the question to

treat them *seriatim.*   The Attorney General claims that the
instructions cover all the questions of law applicable to the
case, and says, ''The only objection that ought to be urged in
that respect is that they are too numerous.''   We agree with
counsel that the instructions ''are too numerous.''   They are
so much so as to be absolutely confusing, if they were free
from defects, inconsistencies and contradictions.

Counsel for the defendant especially claim, and urge with
much earnestness, that instruction No. 13 is fatally erroneous.
The instruction reads as follows:   ''The unlawful killing must
be accompanied with a deliberate and clear intent to take life,
in order to constitute murder of the first degree.   The intent
to kill must be the result of deliberate premeditation.   It must
be formed upon a pre-existing reflection, and not upon a sud-
den heat of passion sufficient to preclude the idea of delibera-
tion.   But there need be no appreciable space of time between
the intention to kill and the act of killing.   They may be as
instantaneous as successive thoughts of the mind.   It is only
necessary that the act of killing be preceded by a concurrence
of will, deliberation and premeditation on the part of the
slayer; and, if such is the case, the killing is murder of the
first degree, no matter how rapidly these acts of the mind may
succeed each other, or how quickly they may be followed by
the act of killing.''

It will be seen that this instruction omits ''malice afore-
thought'' from the definition of murder of the first degree.
It is not contended that malice aforethought is not an essential
element in the crime of murder in the first degree.   But coun-
sel for the State say the instructions must be considered and
construed together as a whole, and, as in other instructions
the court properly defined murder in the first degree, the de
fect in the instruction under consideration is thereby cured.
This would be correct if the instructions taken as a whole were
harmonious and free from contradictions.   In this instruction
the court not only omits the words ''malice aforethought''
entirely, but says ''it is only necessary that the act of killing
be preceded by a concurrence of will, deliberation and pre-

meditation on the part of the slayer; and, if such is the case, the killing is murder of the first degree." We think this is a defective and erroneous definition of murder in the first degree, and not in harmony with other instructions given by the court defining this crime. It is unnecessary to say whether this error, standing alone, would be considered sufficient to authorize a reversal of the case. Nevertheless, we cannot but disapprove of the instruction. It is a dangerous instruction, and so well calculated to produce damage and prejudice, even when considered with all the other instructions, that it is difficult to say that it is not fatally erroneous.

It is contended by the counsel for defendant that the court, in its instructions, declared it to be the law that it was the duty of defendant to retreat, or use all reasonable means in his power to avert the necessity of killing, before he would be justified in killing his adversary. This question was fully treated in *State* v. *Rolla* (recently decided by this Court) 21 Mont. 582, 55 Pac. 523; and, as this case must be retried, reference is made to that case for the guidance of the court as to the law on this subject.

Counsel for defendant also complain that the instructions throughout limit the defendant's right to slay deceased in self-defense to a case of absolute or actual necessity, ignoring the right of defendant to act in case of apparent necessity. If the instructions are subject in fact to this criticism, the error may be corrected on a new trial.

The court instructed the jury, in effect, that if the defendant killed the deceased under circumstances that would not induce an ordinarily courageous man to believe himself in danger of losing his life or receiving great bodily harm at the hands of deceased, or that, at the time of the killing, the defendant had no reason to believe that the deceased intended anything more than to have a fair fight with the defendant, then the defendant could not claim to have acted in self-defense in killing deceased. Counsel claim that the expressions "an ordinarily courageous man" and "a fair fight" are unauthorized in the instruction, because the statute says a "reasonable man,"

instead of the kind of man described by the court, and that there is no such thing as a fair fight known to the law. It is to be deplored that, in these important trials, courts will not follow, as far as they can, the language of the statute. We are at a loss to determine what conclusion the jury would arrive at when they undertook to decide just what was meant by a fair fight. What kind of a fight would have been fair between the defendant and the deceased, the latter having been, as the evidence discloses, a very powerful man, and, as one witness says, "a big brute of a nigger," much the superior of the defendant physically? Such expressions in instructions are undignified and meaningless, or may mean anything, according to the view a juryman might take of the matter.

We do not consider it necessary to treat the many assignments of error in this record one by one. We cannot do so. What we have said in discussing the particular assignments above may be easily applied to other assignments of error in the record.

The great trouble we experience, after looking carefully at the whole record in this case, is found in our inability to say that the defendant has had a fair trial. The law of the land guarantees to every man a fair trial. Looking over the record, we see so many technical objections of the prosecuting attorney to competent evidence offered by the defendant, and so many technical rulings of the court in excluding such testimony, as well as in admitting testimony of like character on the part of the State; we find so many instructions that approach so closely the border line of prejudicial error, if they do not in fact cross it; we see such a confused and voluminous mass of not wholly harmonious declarations of law given to the jury—that we are constrained to conclude that the defendant has not been awarded what the law declares to be a fair trial. The action of the prosecuting attorney and the court in the trial of this case, especially in the introduction of the evidence, is not dissimilar from that disclosed in *State* v. *O'Brien,* 18 Mont. 1, 43 Pac. 1091, and 44 Pac. 399. In that case, commenting on the action and duty of the prosecut-

ing attorney and court in such case, this Court said: "The record shows that almost every question asked the witnesses for the defendant was objected to by the counsel for the State. Many of these objections were wholly without merit, as they sought to exclude from the jury matters directly connected with the scene of the homicide, the conduct of the parties, and the homicide itself. This practice is to be censured, and we quote the following language of the Supreme Court of California (*People* v. *Williams,* 18 Cal. 195) as particularly applicable to this case: 'As no man ought to be convicted unless, on a full exposure of the merits of the case, he is really guilty, it would seem that little or nothing is to be gained by interposing technical objections to keep a knowledge of the whole case on its legal merits from the jury. Questions as to the admissibility of evidence frequently arise, and, in the hurry of a *nisi prius* trial, the best judge may err, especially when suddenly called to pass upon them without the aid of books or argument. These constitute the usual grounds of reversal. Whenever there is any doubt of the question, or, rather, whenever the evidence proposed by the defense is not plainly inadmissible, it is better to let it go in, since, in nine cases out of ten, a single equivocal fact, of doubtful bearing upon the case, would have no effect upon the judgment of the jurors, who are usually disposed to pass, and do pass, upon the general merits. Not unfrequently the offer to make the proof and the exclusion of it have about the same effect on the minds of the jury—though they should not—as if the proof were introduced. If the course here suggested were pursued by the prosecuting attorneys, we are convinced that the number of convictions would not be less than at present, while the number of appeals, or, at least, the number of those successfully prosecuted, would be greatly diminished.' "

There is no serious contention here that the evidence does not support the verdict. The errors complained of are those of law. We regret exceedingly that, on account of such errors, these important trials, costing so much of time, labor, and taxes, should end in failure so often to accomplish perfect

justice.   But, nevertheless, we cannot escape or shirk the responsibility of securing, as far  as we  can, a fair  trial  to all persons charged  with crime in this  jurisdiction, let  the costs and consequences be what they may.    The judgment and order appealed from are reversed, and the cause remanded for a new trial.

*Reversed and remanded.*

HUNT and PIGOTT, JJ., concur.